**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

FILED

Oct 09 2014, 8:49 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAMES M. ROSS IV, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 84A01-1401-CR-43 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VIGO SUPERIOR COURT
The Honorable John T. Roach, Judge
Cause No. 84D01-1301-FC-85

**October 9, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

James M. Ross IV was convicted after a jury trial of battery resulting in serious bodily injury[1] as a Class C felony. He appeals his conviction, raising several issues, of which we find the following dispositive: whether the State presented sufficient evidence to rebut Ross's claim of self-defense.

We reverse.

## FACTS AND PROCEDURAL HISTORY

On January 6, 2013, Kelly Lund was in her apartment at 1811 North Eighth Street, Apartment 2, in Terre Haute. Indiana. She had recently moved into the apartment in December 2012. In the evening of January 6, Lund's cousin, Ross, was at the apartment with Lund when William Powell, who was a good friend of Lund, arrived between 6:00 and 8:00 p.m. Powell, who was intoxicated, entered the apartment without knocking, started yelling, and asked Ross, "What the fuck are you doing here?" *Tr.* at 421, 436. Powell had already shown up twice at Lund's family event that day and was asked to leave due to his intoxication. When Powell showed up at Lund's apartment that night, he was carrying a nearly-empty fifth of Early Times whiskey.

Powell argued with Ross and proceeded to remove his coveralls while he stood in the kitchen. Powell had already urinated on himself. He then went into the bathroom, and "was so loaded that he . . . soiled all over the floor." *Id*. at 423. When Powell returned from the bathroom, he continued to argue with Ross. Powell grabbed a grate off of the stove, and "was going to strike [Ross] with it," but Lund grabbed the grate out of Powell's

---

[1] *See* Ind. Code § 35-42-2-1. We note that, effective July 1, 2014, a new version of this criminal statute was enacted. Because Ross committed his crime prior to July 1, 2014, we will apply the statute in effect at the time he committed his crime.

hands and returned it to the stove. *Id.* Lund went to the bathroom to clean up the mess Powell had made, and when she returned, Ross and Powell were "in the scuffle." *Id.* at 424. Powell was on the floor, and Lund saw Ross kick Powell "in the butt" a couple of times and tell Powell "to get up and quit disrespecting, and act right." *Id.* at 425. On a scale from one to ten, with one being a tap and ten being all of a person's force, Lund rated the kicks as a "4." *Id.* at 426. After that, Ross told Lund "let's go," and they left Powell in the apartment because they thought he would go to sleep. *Id.* at 425.

Just before 11:00 p.m., Terre Haute Police Officer Brent Heaton received a dispatch to 1805 North Eighth Street. The resident of that address reported that someone had come to the resident's door and requested the resident call the police. When Officer Heaton arrived, he saw a man, later identified as Powell, standing in the front yard. Officer Heaton walked toward Powell and asked him "what the problem was." *Id.* at 399. Powell ignored the officer and walked away. Officer Heaton stopped Powell again and asked whether he had called the police and what the problem was; Powell again ignored the officer. Officer Heaton shined his flashlight in Powell's face and noticed that Powel had a small amount of dried blood on the bridge of his nose and swelling around one of his eyes. Officer Heaton could smell alcohol on Powell's breath and saw that Powell stumbled when he walked. Powell clearly did not want to speak with the officer and kept trying to move away. Officer Heaton asked Powell for identification, and Powell indicated that he lived in the house directly north of 1805 North Eighth Street, in apartment number two, which was the back apartment. When Officer Heaton ran a check for outstanding warrants, he learned that Powell had an active arrest warrant. The officer arrested Powell, and as he

3

was placing Powell in custody, the officer asked Powell if he needed any kind of medical attention; Powell said no.

Officer Heaton and another officer went to check out the apartment where Powell had claimed to live. When they arrived at the apartment, which was Lund's apartment, the door was open and loud music was playing inside. The apartment was empty when they checked to see if anyone inside was injured or could tell them what happened to Powell. Inside the apartment, Officer Heaton observed several items in the bathroom had been knocked over and broken glass from a glass top table was on the bathroom floor. He also saw that a pan of soup had been knocked off the stove and spilled on the kitchen floor. The soup from the spilled pan matched a food stain that Powell had on the seat of his pants. From this, the officers concluded that Powell may have fallen or sat in the soup due to his intoxication and obtained his injuries in that manner. The officers left the apartment, secured the door behind them, and transported Powell to jail.

When the police arrived at the Vigo County Jail to book Powell into jail, Powell underwent a portable breath test and tested over .25. Pursuant to jail policy, anyone who tests over .25 is to be taken to the hospital, so Officer Heaton drove Powell to the hospital. Powell was examined by medical staff, and his vital signs were recorded. When asked if he had been in a fight, Powell laughed and did not report that he had been the victim of a beating. *Id*. at 409. Fifteen minutes later, the medical staff cleared Powell to return to the jail.

After Lund and Ross left Lund's apartment, Ross took Lund to stay at a cousin's house. The next morning, Lund and her cousin's boyfriend returned to Lund's apartment,

4

and Lund found her bathroom "destroyed." *Id*. at 429. She saw that Powell had made "some kind of soup" that was spilled all over the floor. *Id*. She noticed that "[e]verything was broken in the bathroom," and Powell had thrown all of Lund's canned goods out into the snow through the bathroom window. *Id*. at 430. Lund called the police to report the damage, and they responded and took photographs of the inside of the apartment.

After returning from the hospital, Powell was placed in the drunk tank at the Vigo County Jail at 12:06 a.m. and stayed there until he went to the medical unit several hours later. Around 10:56 a.m. on January 7, 2013, Powell asked to see a nurse. Powell saw Nurse Susan Streeter at that time. Powell was still intoxicated and writhing in pain and complaining of stomach pain. Nurse Streeter checked Powell's stomach, and observed no marks or rigidity. Powell's only visible injury was a black eye. The medical records reflect that Powell was beaten, "kicked in head and face," was in "visible mild distress," and had "questionable abdominal trauma." *Id*. at 478-80. No abdominal x-ray was taken due to the fact that the jail's portable x-ray company did not respond to the jail's calls.

Powell was moved to cell block G at 4:30 p.m. on January 7, 2013. He remained in the cell block until approximately 9:42 p.m. when he again went to see the nurse. Powell was in such pain at that time that he had to be taken to the medical unit in a wheelchair assisted by other inmates. At this time, Powell was no longer intoxicated and described his abdominal pain to the nurse as a ten on a scale of one to ten. He told the nurse that he had been kicked several times during a fight the previous night. Powell complained of both rib and abdominal pain from the fight. Nurse Streeter was concerned about Powell's head injuries and why a CAT scan had not been done.

5

Sometime between 2:30 a.m. and 3:00 a.m. January 8, 2013, Powell was found dead in his cell. A death investigation was conducted, which included a review of jail records, interviews with jail staff, and review of all video surveillance. The jail staff reported no altercation involving Powell occurred during the period that he was incarcerated, and the security tapes did not reveal any altercations in which Powel may have been involved, any inappropriate contact by anyone, or any accident which could have injured Powell.

On January 9, 2013, the State charged Ross with involuntary manslaughter as a Class C felony and battery resulting in serious bodily injury as a Class C felony. At trial, Lund testified that Powell entered her apartment aggressively and was the aggressor in the altercation with Ross. *Id.* at 435. Lund testified that the kicks from Ross that she observed appeared to be designed to stop Powell's disruptive behavior, but not to hurt him. *Id.* at 436-37. Dr. Roland Kohr, who performed the autopsy on Powell, testified that Powell died from acute bacterial peritonitis, which is inflammation of the internal abdominal cavity, arising from a ruptured small intestine caused by blunt force trauma to the anterior abdominal wall. *Id.* at 511, 529. Powell's peritonitis was caused by a small perforation in his small intestine from which the intestinal contents leaked. *Id.* at 511. Dr. Kohr reported Powell's body had only "minor external trauma" consisting of a bruise to the left eye area with no brain injury, and a scratch in the mid-forehead. *Id.* at 509-10. He also found a superficial abrasion on Powell's left abdominal wall and two "punctate abrasions" over the right hip area, which were each about a millimeter in diameter. *Id.* at 510. Dr. Kohr discovered pus-filled or cloudy acidic fluid inside of Powell's abdominal cavity and pus covering the surface of the bowel. *Id.* at 510-11. Dr. Kohr testified that the existence of

6

an infection, like that in Powell's body, can occur rapidly in someone with a compromised immune system and take several days in others. *Id*. at 524-35. Because Powell did not appear to be in the best health, Dr. Kohr estimated that Powell had suffered the rupture at least twenty-four hours and maybe as long as seventy-two hours before his death. *Id*. at 525. Dr. Kohr testified that the amount of force needed to rupture the small intestine varies depending on the degree to which the intestine is filled and that blunt force trauma can be caused by anything that does not have a sharp cutting edge. *Id*. at 531-32. Due to the lack of injury to other internal organs, Dr. Kohr stated that the force Powell was subjected to would have had a "fairly narrow area of application," such as a fist, heel, kick, end of a baseball bat, or a rifle butt. *Id*. at 532-33.

During the trial, Ross objected to preliminary instruction No. 5 and final instruction No. 6, which were instructions on reasonable doubt. The trial court overruled his objections. At the conclusion of the trial, the jury found Ross not guilty of Class C felony involuntary manslaughter and guilty of Class C felony battery resulting in serious bodily injury. The trial court sentenced Ross to six years, with four years to be served as a direct placement in work release and two years suspended to probation. Ross now appeals.

## DISCUSSION AND DECISION

Ross raised a claim of self-defense at trial, which he now argues the State failed to rebut. When a defendant raises a claim of self-defense, he is required to show three facts: (1) he was in a place where he had a right to be; (2) he acted without fault; and (3) he had reasonable fear of death or serious bodily harm. *McCullough v. State*, 985 N.E.2d 1135, 1138 (Ind. Ct. App. 2013) (citing *Wallace v. State*, 725 N.E.2d 837, 840 (Ind. 2000)), *trans.*

7

*denied*. The State must then disprove one of the elements beyond a reasonable doubt. *Id*. (citation omitted). We review claims of self-defense using the same standard as any sufficiency of the evidence claim. *Id*. (citing *Wilson v. State*, 770 N.E.2d 799, 800-01 (Ind. 2000)). Our standard of reviewing claims of sufficiency of the evidence is well settled. When reviewing the sufficiency of the evidence, we consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not reweigh the evidence or assess witness credibility. *Id*. We consider conflicting evidence most favorable to the trial court's ruling. *Id*. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*. It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id*. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id*.

Ross argues that the evidence presented at trial was insufficient to support his conviction for battery resulting in serious bodily injury because he proved that he acted in self-defense, and the State failed to rebut his claim of self-defense. He contends that the evidence showed that he was in a place where he had a right to be, Lund's apartment to which he had been invited by Lund. He next asserts that the evidence showed that he did not provoke, instigate, or participate willingly in the violence. Ross further alleges that, due to Powell's actions, he had a reasonable fear of death or great bodily harm. He argues that the State did not present sufficient evidence to rebut any of the evidence proving he acted in self-defense.

8

The evidence presented at trial showed that, at the time of the offense, Ross was at Lund's apartment. She was his cousin, and he had been invited to the apartment by Lund. The evidence also established that Powell, who was intoxicated, entered the apartment without knocking, started yelling, and asked Ross, "What the fuck are you doing here?" *Tr*. at 421, 436. Powell argued with Ross, and after urinating on the floor in the bathroom, he continued to argue with Ross and grabbed a metal grate off of the stove, and "was going to strike [Ross] with it." *Id.* Lund grabbed the grate out of Powell's hands and returned it to the stove. Powell and Ross continued "in the scuffle" when Lund went to the bathroom to clean up the mess Powell had made. *Id*. at 424. When she returned to the kitchen, Powell was on the floor, and Lund saw Ross kick Powell "in the butt" a couple of times and tell Powell "to get up and quit disrespecting, and act right." *Id*. at 425. Lund rated the kicks as a "4" on a scale of one to ten and seemed to be done to make Powell stop his behavior and not to hurt him. *Id*. at 426, 436-37.

We conclude that the evidence established that Ross was in a place where he had a right to be. The evidence also showed that Powell was the aggressor, and Ross did not provoke, instigate, or participate willingly in the violence. Further, the evidence showed that Ross had a reasonable fear of great bodily harm as, from the moment he entered the apartment, Powell was loud, aggressive, and argumentative toward Ross. At one point, he picked up a metal grate off of the stove and attempted to hit Ross with it, which could have caused great bodily harm to Ross. Even after the grate was taken away from him, Powell continued to scuffle with Ross, and due to the small size of the apartment, was still in close proximity to the stove and could have grabbed a metal stove grate again. The State failed

9

to present evidence to rebut Ross's claim of self-defense. No evidence was presented to show that Powell was not the initial aggressor, that Ross provoked him, or that Ross participated willingly in the altercation. Although the State argues that Ross lost any right to defend himself when Lund removed the grate from Powell's hand, the evidence showed that Powell still remained aggressive and was still close enough to grab the metal grate again. We likewise disagree that Ross's use of force was more than was necessary under the circumstances. In a claim of self-defense, the force used must be proportionate to the requirements of the situation. *McKinney v. State*, 873 N.E.2d 630, 643 (Ind. Ct. App. 2007), *trans. denied*. Here, the evidence showed that Ross's kicks to Powell's buttocks were designed more to get Powell to stop his behavior and not to hurt him. *Tr*. at 426, 436-37. In fact, the evidence established that Powell had no external bruising except on the face. *Id*. at 494, 509-10. We conclude that evidence proved that Ross acted in self-defense, and the State failed to rebut Ross's claim. We, therefore, reverse Ross's conviction for Class C felony battery resulting in serious bodily injury.[2]

Reversed.

BAKER, J., and ROBB, J., concur.

---

[2] Based on our decision in this opinion, we do not reach Ross's argument regarding whether the trial court abused its discretion in instructing the jury on reasonable doubt. However, recently, this court decided *Vaughn v. State*, 13 N.E.3d 873 (Ind. Ct. App. 2014), *trans. denied*, which held that giving an identical instruction to the one given in the present case was not an abuse of the trial court's discretion and that it is not the law in Indiana that such instructions defining reasonable doubt should not be given. *Id*. at 886.