## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 11 2016, 8:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Richard C. Webster
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Brian Williamson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 11, 2016

Court of Appeals Case No.
49A02-1509-CR-1295

Appeal from the Marion Superior Court.
The Honorable Sheila Carlisle, Judge.
Cause No. 49G03-1305-MR-30708

**Friedlander, Senior Judge**

[1] Brian Williamson appeals his 120-year aggregate sentence for two counts of murder, both felonies;[1] robbery, a Class C felony;[2] and carrying a handgun without a license, a Class A misdemeanor.[3] We affirm.

[2] Walter Harris, Jr., was known to deal in marijuana. On the night of May 1, 2013, Harris was with Darius Lloyd at Lloyd's apartment when Williamson contacted Harris, attempting to set up a marijuana transaction. Harris and Lloyd left the apartment in Harris's white sedan at 10:45 p.m.

[3] Harris, Lloyd, and Williamson met later that night at a shopping center in Marion County. Williamson later told the police he had been accompanied by a man he knew as "C.J.," and further claimed he left C.J. with Harris and Lloyd, but the record does not support those assertions. To the contrary, the man Williamson later identified as C.J., Carlton Brown, was serving a sentence of house arrest on the evening of May 1 and was wearing an electronic monitoring bracelet.

[4] A security camera at the shopping center showed that at 11:54 p.m., Harris's car went through the ATM lane at a bank, hit a curb, bounced into the air, and came to a stop in the parking lot.

---

[1] Ind. Code § 35-42-1-1 (West, Westlaw 2007).

[2] Ind. Code § 35-42-5-1 (West, Westlaw 1984).

[3] Ind. Code § 35-47-2-1 (West, Westlaw 2012).

[5]     The next morning, May 2, 2013, a person who worked in the shopping center noted a white sedan was parked near her place of employment. The sedan's windows were heavily tinted. She paid the car no further attention until that afternoon, when someone informed her there was a problem with the car. She called 911.

[6]     Detective Ted Lich of the Lawrence Police Department was dispatched to the shopping center. Upon arrival, he saw a white sedan with heavily tinted windows. There were several small smears of what appeared to be blood on the exterior of the car, including on a door handle.

[7]     The bodies of Harris and Lloyd were in the car, one in the driver's seat and the other in the front passenger seat. Lloyd had been shot once in the back of the head, a fatal injury. Harris had been shot three times: once near the right eye, penetrating his brain; once in the right cheek, which fractured his upper and lower jaws and lacerated his tongue; and once in his neck, which lacerated his jugular vein and carotid artery. The wounds to Harris's brain and neck would both have been fatal. Harris and Lloyd's pockets had been turned inside-out. The car's keys were missing, and Lloyd had no wallet.

[8]     Officers found a small bag of marijuana in the center console. In addition, there were blood smears on the floor, seats, and ceiling and shell casings on the floor. Subsequent forensic testing revealed Williamson's fingerprint was on the exterior handle of the driver's door.

[9] On May 3, 2013, Tyler Feaselman was at an apartment complex where he was employed as a maintenance worker. Williamson's brother, Cordell Clark, leased an apartment there, and Williamson stayed with Clark occasionally. Feaselman found a bank card on the ground near Clark's apartment. The bank card had Darius Lloyd's name on it. Feaselman turned in the card to the apartment complex's manager, who later gave it to the police.

[10] On May 9, 2013, police officers executed a search warrant at Clark's apartment. They found paperwork belonging to Williamson in one of the bedrooms. When they looked in that bedroom's closet, they found a wallet containing Lloyd's Social Security card. They also found a set of car keys, and subsequent DNA testing revealed Harris's and Lloyd's blood was on the keys. In addition, the officers found a handgun in the apartment. The State's firearms analyst was unable to determine whether that gun fired the bullets that killed Harris and Lloyd.

[11] Other officers went to an apartment complex where Williamson's mother lived. They found a car at that location. A registration form found in the car identified Williamson as the owner. Officers also found a backpack in the car. The backpack contained an adapter for plugging a cell phone into a wall outlet, and subsequent DNA testing showed the adapter had a mixture of Harris's and Lloyd's blood on it.

[12] The police arrested and jailed Williamson. While he was incarcerated, Williamson called an unidentified person and advised the person to dispose of

an "H.P.," which is a type of gun. State's Ex. 163. In addition, Williamson spoke with fellow inmate Donzahe Pearson. He told Pearson he had "caught two bodies." Tr. p. 337. Over the next several days, Williamson explained to Pearson that he had arranged to buy over fifty grams of marijuana from two men, but he weighed the drug during the transaction and discovered the dealers had shorted him by several grams. An argument ensued, and Williamson, who was in the back seat of the car, shot both men. The car lurched forward and struck an object before Williamson jumped into the front seat to steer the car to a stop. He stole the marijuana before fleeing. Williamson also told Pearson he had ensured that the gun he had used had been "tooken [sic] care of." *Id.* at 340.

[13] The State charged Williamson with two counts of felony murder; robbery, a Class A felony; carrying a handgun without a license, a Class A misdemeanor; two counts of murder; and a sentencing enhancement for using a firearm in the commission of a felony. The jury determined Williamson was guilty as charged.

[14] At sentencing, the State dismissed the sentencing enhancement. The trial court vacated the felony murder convictions on double jeopardy grounds, determined that Williamson should be found guilty of Class C felony robbery as a lesser included offense of Class A felony robbery, and imposed an aggregate sentence of 120 years on all counts. This appeal followed.

[15] Williamson argues his sentence should be reduced from 120 to fifty-five years. Although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of sentences through Indiana Appellate Rule 7(B), which provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."

[16] Our job is not to determine the correct sentence, but to leaven the outliers to ensure that the trial courts are sentencing defendants appropriately. *Satterfield v. State*, 33 N.E.3d 344 (Ind. 2015). Whether we regard a sentence as appropriate turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad other factors that come to light in a given case. *Hines v. State*, 30 N.E.3d 1216 (Ind. 2015). The burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Gross v. State*, 22 N.E.3d 863 (Ind. Ct. App. 2014), *trans. denied*.

[17] At the time Williamson committed his crimes, murder was punishable by a fixed term of imprisonment of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. Ind. Code § 35-50-2-3 (West, Westlaw 2007). A Class C felony was punishable by a fixed term of between two and eight years, with an advisory sentence of four years. Ind. Code § 35-50-2-6 (West, Westlaw 2005). A Class A misdemeanor was punishable by a fixed term not to exceed one year. Ind. Code § 35-50-3-2 (West, Westlaw 1977). The trial

court sentenced Williamson to sixty years for each murder, to be served consecutively, plus six years for the robbery and one year for the handgun charge, to be served concurrently with each other and one of the murder sentences, for an aggregate sentence of 120 years.

[18] Turning to the nature of the offenses, Williamson ambushed two men during a drug deal. He killed Harris and Lloyd because he believed they had shorted him several grams of marijuana, demonstrating a disturbing lack of regard for human life. After Williamson murdered Harris and Lloyd, he had the presence of mind to take their marijuana, Harris's keys, and Lloyd's wallet before fleeing.

[19] Williamson concedes the murders were "senseless and reprehensible," Reply Br. p. 4, but he argues the nature of the murders was not particularly egregious because the victims apparently died quickly and without severe pain. He cites *Brown v. State*, 10 N.E.3d 1 (Ind. 2014), in support of his argument, but that case is distinguishable. In *Brown*, our Supreme Court revised downward the defendant's sentences for two counts of murder and one count of robbery to two concurrent, sixty-year sentences plus an additional twenty years for robbery. In that case, the Court deemed it significant that the defendant was only sixteen at the time of the crime and was guilty as an accomplice. In the current case, Williamson was an adult, not a juvenile like Brown. Furthermore, Williamson was not an accomplice but rather committed the crimes alone.

[20] Williamson also cites *Taylor v. State*, 840 N.E.2d 324 (Ind. 2006), but that case is inapplicable here. In *Taylor*, our Supreme Court determined the defendant

received ineffective assistance of appellate counsel for failing to challenge his maximum sentence. By contrast, in the current case Williamson did not receive the maximum possible sentence.

[21] As for the character of the offender, Williamson was twenty-two years old at sentencing. When he committed the offenses, he was on probation for a conviction of receiving stolen property. In addition, in 2001, Williamson committed acts which, if they had been committed by adults, would have been considered possession of a firearm on school property, a Class D felony, and disorderly conduct, a Class B misdemeanor. His criminal history and juvenile adjudications are not particularly grave, and the juvenile adjudications are remote in time from the current offenses, but it is troubling that he continues to commit offenses involving guns and taking others' property despite ample opportunities to reform.

[22] Williamson contends he has in substance been sentenced to life in prison, which he claims is inappropriate in light of his relative youth and his record of graduating from high school and attending college. He further claims this sentence bars him from any hope of rehabilitation. Although Williamson will serve a lengthy term in prison, the concurrent sentences he requests "would diminish the lives of his victims." *Wright v. State*, 916 N.E.2d 269, 279 (Ind. Ct. App. 2009), *trans. denied*. Consecutive sentences are appropriate when there are multiple victims. *McCullough v. State*, 985 N.E.2d 1135 (Ind. Ct. App. 2013), *trans. denied*. In addition, Williamson will have opportunities to seek parole if

he behaves well during incarceration. Williamson has failed to demonstrate his sentence is inappropriate.

[23] On a separate note, Williamson argues the trial court's sentencing order, abstract of judgment, and CCS are in need of correction because they do not sufficiently indicate that the trial court vacated his convictions for felony murder and convicted him of C felony robbery as a lesser included offense of Class A felony robbery. In response, the State asserts those documents are correct as is. Having reviewed the sentencing order, the abstract of judgment, and the CCS, we agree with the State that no corrections are needed.

[24] For the foregoing reasons, we affirm the judgment of the trial court.

[25] Judgment affirmed.

Robb, J., and Bradford, J., concur.